All right. We'll hear our next case, which is Beckford v. Elevance Health. And Mr. Brown, we'll hear from you first. Good morning, distinguished members of the panel. My name is Christopher Brown, and I represent Bridget Beckford in this appeal of the dismissal of her claims of discrimination and retaliation at summary judgment. These claims were brought under both 1981 and Title VII, and the thrust of the appeal, the basis for the appeal, is that the district court misapplied the way the McDonnell-Douglas test should be reviewed. And in addition, and regretfully, not until my reply brief did I point out that I argued that the modified fourth prong was improperly, wasn't correctly used by the district court, and that the fourth prong established by this court in Guessis should have been applied. And I've been so concerned about accusing a district court of being wrong on that kind of a point. You know, Guessis has been cited over almost a thousand times since it came out, all in the circuit, you know, district courts and from South Carolina to Pennsylvania, West Virginia. This court has cited it, of course, many times. You've had two opinions just last year. Barnhill v. Bondi, Judge Niemeyer and Judge King, you were on that panel, and there were some interesting points in that case. The temporal proximity issue came up, which is an issue here, which is not an issue here, but you said it would be no longer than two months this should really be accepted, which I thought was curious. I'd always thought it was four, but read in conjunction with Lauren Workman v. Wormuth, King and Harris were both on that panel. That's 2022, 54 F 4th 201. Causation can be shown in two ways, showing that the adverse act bears sufficient temporal proximity. Let's get back to the particular claim here. As I understand it, Maria Gregory was the decision maker here. She was the supervisor that identified the four spots for satisfying the RIF, the reduction in force. Is that right? That is correct. And she made the selection of three persons, plus she chose not to fill one person, and her recommendations were approved by upper management. That is my understanding, as a decision maker, shouldn't we focus on her animus, if any, the evidence that supports her animus in making her selection based on race, disability, age, or any other of the improper motives? Yes, we should. But once the burden shifts, we should. Until the burden shifts, forget that we know the McDonnell Douglas and all that. Just tell me what the evidence in the record shows that Maria Gregory made her decision based on an improper consideration. Simply put, I think the evidence that supports that is a clear understanding that Ms. Ayers, and when we say that she selected three people, it was only one person from this team that was selected. After, she has testified that they need two underwriters on this Virginia Key Accounts team. Nonetheless, there's this issue going on between Ayers and Gregory, where Ayers has engaged in behavior of which Beckford has complained, some of it being very racially discriminatory, allegations of certain language being used, etc. And she had in the past, Ayers, it had been that she engaged in the use of racist derogatory slurs towards minorities. And the way Gregory responded to that was to not reprimand this woman, not cite her, not put anything about it in her evaluations, and to, on the record, in the deposition, admit that it was not a consideration at all when deciding which of the two key underwriters to maintain. So that expresses a bias in favor of a woman not in my class, protected class, she was white, Ms. Ayers, and against Ms. Beckford, who's African American, who has no performance issues. There was no, there was never a claim that said anything to do with performance, except to the extent that when deciding which of the two Virginia Key Accounts members to keep who are underwriters, it was felt by Ms. Gregory that Ms. Ayers would be better able to handle the workload. But it turns out that the evidence shows in the light most favorable to Ms. Beckford, she was handling 90% of the workload during what is known as peak season. So if she can handle workload during peak season, she's never had a problem violating policies, let alone policies that elephants claim represents their core values and are no tolerance policies. To ignore these transgressions by Ayers and the problems with her behavior and having violated these policies, never reprimand her for these policies, don't put anything about it in her evaluations, and don't consider it when making the decision between the two people which one you're going to keep would expose a bias in favor of Ms. Ayers that would show that Ms. Beckford's race or retaliation, depending on which claim we're looking at, was not looked at neutrally. Which is the actual fourth prong of the modified. I paraphrased it a bit. When you say not neutrally, Ms. Ayers complained to Ms. Gregory, right? Ms. Beckford. Beckford, I mean, complained to Gregory, right? Yes, she did. And Ms. Beckford helped her make her claim to human resources, right? Yeah. Did Ms. Gregory help Ms. Beckford make her claim to human resources? Yeah. Well, she facilitated the communication, let's put it that way. Yeah. Not for all of the complaints, some of the complaints she didn't take. And so she referred the complaint to the appropriate people at the company, and the company conducted an investigation, didn't they? They did. And they found some animus related to comments relating to Mexicans taking advantage of some of the public benefits in America. But nothing further, right? It was, I think, was it Mexican and Indians, Disney Meyer, but it was not African Americans. Yes, that's correct. Yeah. All right. So that's that whole incident. Now, where does that show animus by Ms. Gregory? Well, I don't know that to show animus. I have to show that she had a bias in making her selection that didn't treat either her protected class or her retaliation neutrally or fairly. So did she have animus towards Ms. Beckford? I think that she discriminated against Ms. Beckford when she decided to keep the Caucasian woman, despite the fact that this woman had been found to have violated core policies of the company. So we're looking at two people. One is in a protected class. One is not. And one person has violated your core policies. Yes, Judge King.  I'm sorry? Gregory was the decision maker. Gregory was the decision maker. And then she had hired Ms. Beckford. She had. That's the proud inference the appellees cited. I thought you were challenging the validity of the RIF. I am. You haven't mentioned that. How's that supported? You're saying the RIF was illegitimate? I'm... If we read a quote from Gessis at 2.20, Fairview contends that it had been considering the elimination of Gessis' position for two to three years before she was terminated, but there is no evidence in the record documenting the existence of a years-long evaluation of the need for Gessis' position. Similarly, in this case, they claim that this issue about a RIF had been discussed for almost a year, maybe longer, eight to 12 or more months. And they were unable to produce one email, one letter, one note discussing a RIF, which is a pretty significant issue within a company, to do a deduction of $550,000. There was something produced that had the year 2015 on it, I thought you said. It was the list of people that were going to be RIFed, which had a date of 2015 at the bottom, which the appellees want to explain away, but my response is that's a jury issue of credibility and what their explanation is to be the why it's dated 2015. And this was in what, 2021, 22? Yes, 2000. Is there any other documentary evidence of a RIF other than that 2015 record? The only other document is the packet given to Ms. Beckford when she was terminated, discussing the RIF and we chose you for these reasons. But like in Gessis, after the fact documents, the jury is free to find, as I argued, that, of course, if you're going to say it's a RIF and you're going to terminate the person, you're going to come up with something to give her that says RIF. But they can't come up with anything that predates the termination, other than this list that's dated 2015, which is curious, that would support or corroborate a self-serving statement that this discussion of a RIF had been taking place for a significant number of months. And evidence that a reason is false is going to support the denial of the motion for summary judgment, to put it succinctly. Can I ask you just kind of a technical question? And I just assume, purely hypothetically, for the sake of argument, I'm just trying to work my way through the case, that I think the district court's analysis improperly imported into the prima facie case analysis, it sort of took for granted the credibility of the proffered reason for the termination. And that, in fact, your client did make out a prima facie case of discrimination and retaliation. At that point, would I remand to the district court to consider the proffered justification now with the burden on the employer and the arguments about pretext and whether, in fact, the real reason was discrimination or retaliation? Or do you think we should address that issue ourselves? I think this court would be in a position to remand the case, say the district court erred, and, in fact, say for an issue of judicial efficiency, make a determination from the record that there was sufficient evidence to rebut the non-discriminatory reason given by the employer for termination. Usually we would let the district court do that in the first instance. You know, we usually let the district court go first. I understand. The court made really clear it wasn't getting to that issue. But that's fine. But your preference would be you think we should reach that. My preference, so that we don't end up back here in six months or after this opinion comes out, would we be remanded and say the district court erred in considering these statements by the employer at the prima facie stage and remanded it to find that a prima facie case was made but to then engage in the shifting burden? I fear I may result back here with the district court's sentiments expressed in the opinion about the facts presented by the appellee. That would be my concern. But I'd be more than happy to go make that argument and try and persuade the court otherwise. You know, an interesting point that came out in one of these cases was that in guesses. So why don't you bring that up on your rebuttal, okay? Certainly right. Yeah, okay. Thank you. We'll proceed to hear an argument from Ms. Hager at this point. Thank you, your honor. May it please the court, I'm Ashley Hager and I represent Elevance Health which was known as Anthem in this case. And this court should affirm the district court's decision to grant summary judgment on Ms. Beckford's claims of race, discrimination, and retaliation because Ms. Beckford hasn't identified genuine issues of material fact in this case. Even construing all the facts in her favor, Anthem is entitled to judgment as a matter of law. But in construing all the facts in Ms. Beckford's favor, this court is not required to and should not, may not, consider facts that aren't supported by record evidence or that have been disproved by the record evidence. And, you know, a good example of that does involve this claim that Ms. Beckford continues to make that she carried 90% of the workload during peak season. And in our briefing we have pointed out that she is basing that exclusively on two documents that were not produced in discovery and that don't say what she says they did. And Ms. Gregory has explained that the documents were only a snapshot in time. One of the documents only shows that there was, that there were more quotes outstanding that Ms. Beckford was behind in her quotes rather than the number of accounts that they were, that both Ms. Beckford and Ms. Ayers were handling. So we continue to try to knock down this straw man of an argument that there was, that Ms. Beckford was engaged in, had a bigger workload than Ms. Ayers. But it's really irrelevant anyway. Excuse me, I'm sorry. The 90% figure, what's your number? Your Honor, we, our decision maker, Ms. Gregory, has testified that the workloads of the two individuals were roughly equal for two reasons. Number one, they each had their own territories they were supporting and the number of accounts ebbed and flowed. But then also Ms. Ayers... Viewing that issue in the light most favorable to the plaintiff, what's the proper number? The proper number, I'm sorry, I don't believe there's a specific number because it does ebb and flow and Ms. Ayers had additional tasks. She was not just handling accounts. So there's a dispute between 90% and 50%. There's a dispute of fact. There's a dispute of fact, but it's not based on any record evidence. It's based on documents that don't show what Ms. Beckford says they stand for. And on the other side of that is Ms. Gregory's undisputed testimony that the workload does ebb and flow, which Ms. Beckford also talked about in her deposition. But I have to emphasize as well that the issue of who had the greater workload was not one of the factors that Ms. Gregory considered in making her decision of who to let go. She only considered four reasons for the termination. And we've discussed those at length about who had the greater tenure. There's no dispute there. And Ms. Beckford admits that Ms. Ayers had 14 years versus her two years. Who had better performance? No dispute there. Ms. Beckford meets expectations, but Ms. Ayers had exceeds expectations on her review. Can I just... But they're the four reasons and they all kind of boil down to job performance. And I thought one of the arguments about pretext, and I'd like to get your response to, although I'm not sure we should be getting to pretext, but one of the arguments is, well, they say, at least in the letter they sent to Ms. Beckford, when you decide who should go in a RIF, you're only supposed to consider performance as 50% of kind of your decision-making with 30% for values and I think 20% for where you are in your career path. And it seems like, by her own account, that's not what happened here. This was a case of sort of an employer not following its own policy on how to make this decision. And we usually have said that when you depart from policy, that's evidence from which a jury might infer there's something funny going on here. So how is that not an issue here? So a couple of ways. First of all, the document that Your Honor is referring to was the Older Workers Benefits Protection Act notice that was given to Ms. Beckford in connection with the RIF. And in that, it provides those three reasons that were considered for all the folks who were let go, 57 folks, I think was the number. And so it does mention the skills and competencies required to successfully perform the job. And all of Ms. Gregory's reasons can be characterized as the skills and competencies required to successfully perform the job. The other factors like career potential and values are all encompassed in the performance evaluation as well, because that does look at values and career performance if you look at the factors in that performance evaluation. So there's not an inconsistency. I mean, I think the argument here that Mr. Brown has made is a shifting reason argument. I will note, by the way, that that is a brand new argument that was made on appeal. So the court shouldn't consider it. But if it did decide to consider it, we don't believe there is any shifting reason. Ms. Gregory has testified to those four reasons. There's been no rebuttal of them. In fact, Ms. Gregory has admitted to them or just ignores them. And they don't quite all boil down with all due respect to just job performance. One of the reasons I would note is who has experience and understanding of the non-underwriting work that's required for handling renewals, which is necessary when the person who handles renewals is out. And so there's a coverage issue. And who has that ability? It's Ms. Ayers. Can I ask you the same question I asked your colleague?  Because now we're talking about a pretext analysis that the district court never did. So just assuming, again, for purposes of argument, that I think the district court analysis here was flawed because the district court, in finding no prima facie case, was relying on and crediting the proffered reasons given by the employer without considering the pretext challenge. So we've got a problem in the analysis. And assuming, again, that I thought there was enough here for a prima facie case, would it, in your view, what should the next step be? Should we, in the first instance, consider the pretext and the ultimate question of whether a jury could find discrimination or retaliation here? Or should we remand and let the district court do that first? Thanks for the question. I think that this court could and should issue a decision based on if it doesn't agree on the pretext. I'm sorry, on the prima facie case portion of the case. It could and should issue a decision on pretext. Because as your honors are well aware, the court can, well, we are permitted to defend the ruling on any ground that was presented to the district court, whether the district court considered it, ruled on it or not. It still was a ground, obviously. We presented the argument both on prima facie case and pretext. It was presented to the district court. The district court also did a yeoman's task of sorting through the evidence here, even though not all of that evidence was relied on in its opinion. When you look at the facts in the memorandum of opinion, the district court very carefully sifts through and identifies some of the issues with these factual conclusory statements that Ms. Beckford made and parses through them and determines that there's no support for this one or this one wasn't produced on discovery or whatever it might be. So I believe that this court does have everything it would need to make a determination on a prima facie case. If I may, though, I'd love to just briefly address. I want to ask you about this allegation of a rip. Isn't that a contested question of fact? Whether there was a legit rip since you have a record that shows that you deal with a rip in 2015, which was six years earlier than this decision was made. It's certainly contested. It's an argument that Ms. Beckford and her attorney have made throughout this case. And I'm frankly, I'm flabbergasted by it because their argument that it's contested is not based on any record evidence whatsoever. It's based solely on- Well, I just cited you the record that says 2015 instead of 2021 for the rip. Yes, Your Honor. Is that the only record you have or do you have more than that? I'm sorry, I spoke over you. Could you repeat the question? Do you have other records that indicate something other than 2015? Yes, Your Honor. Several, many. So first of all, we do have the packet of information that was given to Ms. Beckford. It's very standard in these cases. It's a 30-page packet that goes through what happens in a riff and what your benefits are and who else was impacted with all the job titles and so forth. So that obviously is a document, whether it was created before her termination. Obviously, it was given to her at termination. And that certainly is one document that Ms. Beckford produced as well, not just Anthem. In addition, we do have the spreadsheet in question. And I'll get to the rest of your question in one moment on that as far as other records as well. But just with respect to that spreadsheet. So this is a spreadsheet that HR used to, and if you look at the full spreadsheet, it shows a list of all of the individuals who were impacted in the rift, their demographics, the severance calculations. There's a lot of information in this rift. It's sort of the master document that HR was using. Yes, there is a footer in that document when it's printed out that says 2015. I do not understand how Ms. Beckford can argue that that in and of itself shows that this was a document that was fabricated. There's footers in documents, obviously, all the time. And especially when a form is used, it might have been an old form. But if it's an old form, it would be different if that footer had a date of 2021. The rift took place in 2020, and the decision was made then. So it would have been different if that footer said, oh, April of 2021. That might show it was created after the fact. The fact that it showed 2015 shows that whenever someone put that spreadsheet together, they used the form that had a footer in it. So that footer is really a red herring here. It doesn't prove anything that would suggest that this rift was fabricated. But you're asked as well about other documents. Of course, with a rift of this size, Anthem had numerous communications back and forth between HR and the managers who are making the decisions. And of course, there's a number of those documents. Mr. Brown likes to say that we have produced none of those. But the fact is, is that he never requested it. If you said a rift this size, are you saying that the rift involved more than the two individuals? Yes, Your Honor. The reduction of one job? It was beyond? So this was an organization-wide rift. The portion of the organization that Ms. Beckford and Ms. Ayers are in, that there were 57 people terminated as a whole. Within Ms. Gregory's department, she terminated four people, got credit for two people who had moved out. Within the sub-sub department that Ms. Ayers and Ms. Beckford were in, the Virginia underwriters, it was just Ms. Ayers and Ms. Beckford, and Ms. Beckford was selected. Hopefully, that clarifies that. But it was one of those two? Yes. You're saying? She made the decision that she would eliminate... Ms. Gregory made the decision that she would eliminate one of the two Virginia underwriters. Yes. But of course, there were a number of documents that support the rift. Mr. Brown never requested those in discovery. If he had, I'm sure he would have produced a copy of the discovery request that said, show me every document explaining that there was a rift. That wasn't responsive to any question that he asked. It wasn't responsive to the initial disclosures. We produced the documents that went to the issue of why was Ms. Beckford terminated? And that was the spreadsheet. And then obviously the testimony from Ms. Gregory. We also had our 30B6 witness testified about this rift. So it's far from the case that there is nothing to support this rift. There is undisputed testimony from Ms. Gregory and Ms. Thompson, our 30B6. Ms. Beckford was told that she had a rift. And all of these arguments about, oh, there's an old date in the footer, don't create a genuine issue of material fact over whether the rift even existed. So hopefully that addresses your question on that point. I do think it's important to note as well that because I should also point out that the whether a rift existed or not doesn't really go to the issue of the four reasons that Ms. Gregory testified to as to why she decided to terminate Ms. Beckford instead of Ms. Ayers. Those reasons are undisputed and really unchallenged. Several of them Ms. Beckford doesn't even challenge. And then in addition, Ms. Beckford hasn't done anything to link the decision to show that there was some evidence that Ms. Gregory was animated by a racial animus or a retaliatory animus, which this is a case involving disparate treatment. Mr. Brown, I'm sorry. What weight, if any, was given to the racial remarks? Ms. Ayers? Yes, the investigator found that Ms. Ayers did make one comment about Mexicans, something to the effect that they were leeching off of the system. There was also evidence of other remarks, were there not? There were complaints of other remarks. Ms. Beckford complained. Those were brought to Ms. Gregory's attention. Ms. Beckford did not share the details of what she was claiming about Ms. Ayers' comments with Ms. Gregory, but she did bring the details of those to the associate relations, the HR investigator. And those were all investigated by that investigator, who happens to be Black, and he only substantiated the one comment about Mexicans. And as I believe Judge Niemeyer was alluding to earlier, there is nothing in that that shows any kind of a racial animus towards Black people or towards Ms. Beckford particularly. So, this argument that Ms. Gregory failed to use of the N-word and flying or using a Confederate flag emblem or a flag surely don't show much neutrality. But, Your Honor, with all due respect, those were not substantiated by the investigator. What does that mean exactly? Does that mean the investigator found it didn't happen? The investigator did not conclude that it did happen. Right, but just couldn't say one way or the other. Yes. From Ms. Gregory's perspective. Do I understand that as far as this record's concerned, there's no imputation of that information to Ms. Gregory? As a matter of fact, Ms. Gregory continually assisted Ms. Beckford, and Ms. Beckford continually wrote loving emails to her, trusting her and complimenting her as a boss and so forth. It's hard to find that the decision maker who that evidence is not even imputed to. It was a claim that she referred to HR and she didn't even know the details of it. She just assisted the claim go that Ms. Gregory had any animus in this kind of thing. This is a rare case in which I was unable to find a single piece of evidence supporting animus imputable to Ms. Gregory. But maybe there is some, but I didn't see it myself. No, Your Honor, obviously that is exactly our position. Not only did Ms. Gregory file those complaints on Ms. Beckford's behalf, so that shows she didn't have an animus based on complaints. She also hired Ms. Beckford and fired her, so that shows that she didn't have an animus based on race. Ms. Beckford admits, I think we can't forget this, Ms. Beckford admitted in a sworn statement to the EEOC and in her deposition that she didn't even think that she was fired because of her race. She thought it was all about the complaints. So there is no evidence, on top of the warm relationship that Your Honor has mentioned, there is no evidence of any racial animus or any retaliatory animus on the part of Ms. Gregory. In fact, those warm emails that were exchanged between them took place after the complaints had been filed. So even after Ms. Beckford had filed complaints against Ms. Ayers and even after they had been found to be unsubstantiated with respect to her race, then she is still telling Ms. Gregory, you're an excellent leader, I'd love to keep working for you. But it's really important also to contrast that with what evidence is there of animus. The only things that Mr. Brown points to is that Ms. Gregory didn't discipline Ms. Ayers for this comment that was made about Mexicans. How would that show a discriminatory animus against Black people? And how would that show a retaliatory animus against the woman who made the complaint? It doesn't. Let me refer you to page four of the district court opinion about the investigative file in the first investigation. It includes allegations that Ms. Myers quote said derogatory things about African-Americans using the N-word specifically. And drew a picture with a brown, with brown markers and stated that the person looked like a N-word. The investigative files also include Mrs. Beckford's allegations that Ms. Ayers stated on Martin Luther King Day that she had a confederate flag at home. And on a different occasion, Ms. Ayers remarked that Hispanics and Mexicans are leashing off the system and we're paying taxes for them. She cites, that is the district judge, the Thompson declaration, exhibit one, at page two. Yes, your honor. I don't want to interrupt. Yes, your honor, those are all allegations that Ms. Beckford made. That's in the record? It's in the record that those were allegations that Ms. Beckford made to the associate relations, the HR department investigator. Those, I'm sorry, I see that my time is up. May I? Yeah, you can answer. Yeah. So those are absolutely allegations that Ms. Beckford made to the associate relations investigator. But the investigator did not substantiate any of those allegations with the exception of the one comment about Mexicans. And what was Ms. Gregory told, the decision maker? She was told that the comment about Mexicans was substantiated. That's all she was told. And she's explained how she intended, she held a diversity and inclusion discussion with her team when she heard about that. And she was planning to issue discipline to Ms. Ayers for that. But this was in mid-March of 2020. And we all know what it was like when the entire world shut down on a dime. So she said that she forgot to issue that discipline. But none of that shows a racial animus towards Black people or to Ms. Beckford, or that she was angry at Ms. Beckford for having filed complaints. Quite the contrary, given her behaviors in this case. All right. Thank you. Thank you, Ms. Hager. Mr. Brown, you have some rebuttal? Thank you. I do, very briefly, your honors. In guesses, this court held that the employer's burden in step two is one of production not persuasion. That's an important point. You always hear the accusation that the plaintiff's statements are conclusory. But they don't want the court to accuse them of being conclusory, which speaks to Judge King's question about the 90% workload versus the 50% workload. They can produce nothing to support what they're saying. So they'll accuse my client of being conclusory. And their self-serving conclusory statements are not conclusory. This is what creates the question of fact on that issue. A few other points I want to make. The RIF, the burden is on elephants. The burden is one of production. They can't say you didn't ask for it in discovery. They need to produce and support their burden when the burden shifts to them to show their non-discriminatory reason. Further, Judge King asked about what weight was given to the issues with heirs by Gregory. And it was expressly stated, and it's in the record, that Gregory said, I did not consider it at all in making my decision. Investigations were not unsubstantiated. They were unfounded, meaning, Judge Harris, they could not find that it didn't happen. They couldn't find that it did happen. And that's why that whole issue with the moving of the chair came up, where the district court tried to spin it like, oh, Gregory took care of this and separated them. And the record reveals that's not what happened. Gregory would not respond to Beckford's request. Look, if this is going to be unfounded, I can't sit next to this woman. And Gregory failed to respond. And Beckford took it upon herself to move to a different desk. And that was after the fact approved. So I'm comfortable that the record is sufficient. Of course, we're here on this prima facie case issue. And I think Judge Harris makes a good point. I don't know that you're going to step on the district court's toes before they have had an opportunity to engage in reviewing the shifting burdens. But I would ask this court to find that the district court erred in accepting the non-alleged non-discriminatory reasons for termination given by Elevins at the prima facie stage and finding that Ms. Beckford found no, did not establish a prima facie case of discrimination or retaliation and sustained and granting summary judgment. And if we have to go back to the district court and we do another round of summary judgment, which is what will happen, we will do that. And hopefully we won't have to come back and take up the court's time again. I've understood that on a summary judgment, we reviewed the district court's decision de novo. And we look at the very same record the district court read. And we can rule on that motion for any reason that was raised below. And in this case, the record seems to be complete from both parties' point of view for this summary judgment. Both parties put in all they wanted to put in. So if the district court conducted an improper consideration of the evidence in the record by considering under one category, we still could look at the record and say, does this support summary judgment, I think. Now, I think Judge Harris makes a very good point that if there is a re you have to reexamine the record or reassess the record, sometimes we prefer the district court to do that work rather than we do it. But it seems to me that that would be a discretionary decision for us to make. I think we have the authority and the facility and the materials to review a summary judgment completely as is presented. And I agree. My experience, the court refrains from doing that. For example, in Wayne Jones versus City of Martin. Well, that might depend on the record, right? It may depend on the record. And every record is different. And I think we should have to assess that. But I just wanted to explore with you, and I gather you agree, that the scope of our task, we can either send it back or we can look at the record ourselves de novo and decide whether a summary judgment was appropriate or not. For example, at Currier versus South Carolina Elections Commission, Judge Harris, who run that panel, that was last year. They found that the district court used the wrong standard. It said the termination was for no other reason than retaliation as opposed to but for. Now, in that case, the court held it didn't result in the employee being held to a higher standard. In this case, I believe it did prejudice my client. The fact that the burden shifting wasn't done properly because the alleged non-discriminatory reasons given the termination, we never got to a point where we're allowed to say, well, what about this evidence of pretext? Now, if it's in the record- Yeah, but see, the burden shifting in a summary judgment is merely analytical. The Supreme Court has observed that. I mean, it's a strange phenomenon. At trial, there's a burden shifting and production and proof and all this other stuff. But when you're on a summary judgment, it's an analytical gate. If the analysis is wrong, you still have the same record. That's my whole point is that our facility to review this is greater than at a trial when it's sequential. And therefore, evidence may not have come in or somebody didn't step up and produce evidence. Here, all the evidence is in the record and we can analyze it or we can have the district court do that for us. I agree that would be up to the discretion of this panel. Yeah, yeah, yeah. All right. Anything further? Nothing further from the panel. Okay, okay. I have- Judge King, do you have a question? No, I was made a comment. I said we could send it back to for a trial if we decided to do that. Oh, I see. If there were a material question of fact, then we would send it back for a trial. Exactly, exactly, exactly. All right. At this point, we would come down in the court and shake your hand and invite you for tea or whatever we could to keep the harmony of the judicial system. In this context, we can only do so virtually. And so we thank you for your arguments and wish you have a fine day. We'll proceed on to the final-
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris